# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made this ⟍⟋ day of March, 2010 by and between **BROWN AUTOMOTIVE GROUP, LTD.**, a Virginia Corporation, or assigns, (the "Buyer") and **GUNNING MOTORS, INC.**, a Virginia Corporation (the "Seller"). In this Agreement, Buyer and Seller are sometimes referred to as the "Parties."

## W I T N E S S E T H:

**WHEREAS**, the Seller owns and operates a Subaru new motor vehicle dealership business (the "Business") located at 9018 Liberia Avenue, Manassas, Virginia 20110 (the "Site") and is party to dealer sales and service agreements with Subaru of America ("Subaru") or the "Manufacturer"); and

**WHEREAS**, the Seller desires to sell and the Buyer desires to buy substantially all of the assets pertaining to the Business, upon the terms and subject to the conditions of this Agreement;

**WHEREAS**, the Site is currently leased from Robert M. Rosenthal ("Landlord") under a ground lease which expires September 30, 2025, whereby the dealership building improvement thereon was constructed by the Seller subject to the Lease;

**WHEREAS**, Seller filed for relief under chapter 11 of title 11 of the U. S. Code on March 13, 2010, in the Eastern District of Virginia, designated as case no. 10-11896.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter contained, the receipt and legal sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## ARTICLE I

### CERTAIN DEFINITIONS

1.1 **"Closing Date"** shall mean the date of the closing of the purchase and sale of the Purchased Assets (the "Closing"), which shall be a date agreed upon by the Parties not later than ten (10) days after receipt by the Buyer of the approvals and the satisfaction of the other conditions as set forth in Articles 8 and 9, or such other date as is mutually agreed upon by the Parties hereto. In no event shall the Closing take place later than May 15, 2010, unless the Parties mutually agree in writing to extend this date by an additional thirty (30) days. The Closing shall be held at the Site at 10:00 a.m. on the Closing Date, or at such other location and time as is mutually agreed upon by the Parties. The Closing shall be deemed to be effective as of the opening of business on the Closing Date.

1.2 **"Existing Lease"** shall mean that certain Lease Agreement dated November 15, 2000, as amended, modified and extended, and assigned to Seller, pursuant to which the Seller leases from the Landlord the real property located at the Site.

1.3 **"Inventory Date"** shall mean the close of business on the date of completion of the Inventory (as defined in Section 4.1), which date shall not be more than three (3) days prior

to the Closing Date, or such other date prior to the Closing Date as is mutually agreed upon by the Seller and the Buyer.

**1.4    Intentionally deleted.**

**1.5    "Purchased Assets"** shall mean: the Parts and Accessories (as defined in Section 4.3); the Special Tools (as defined in Section 5.1); the Leasehold Building Interest (as defined in Section 5.2), the Furniture and Fixtures (as defined in Section 5.3); the Operating Assets (as defined in Section 5.4); goodwill of the Business; and any other assets and properties of the Seller to be transferred to the Buyer hereunder as set forth on Schedule 1.5.

**1.6    "Escrow Agent"** shall mean the law firm of Walton & Adams, P.C., Suite 250, 1925 Isaac Newton Square, Reston, Virginia 20190.

**1.7    "Subaru Dealer Agreement"** shall mean the Subaru Dealer Agreement between Seller and Subaru of America, Inc.,/ Mid-Atlantic Region effective as of February 1, 2009.

## ARTICLE II

### SALE AND PURCHASE OF THE ASSETS

**2.1    Sale and Purchase.** Upon the terms and subject to the conditions hereinafter set forth, at the Closing, the Seller will sell, transfer and convey the Purchased Assets to the Buyer, and the Buyer will purchase the Purchased Assets from the Seller for the consideration set forth in this Agreement. The sale, transfer and conveyance of the Purchased Assets shall be made by the execution and delivery at the Closing of a Bill of Sale in a form reasonably acceptable to Buyer ("Bill of Sale") and such other instruments of assignment, transfer and conveyance as the Buyer shall reasonably request. Except to the extent specifically included within the Purchased Assets, the Seller will not sell, and the Buyer will not purchase, any other tangible assets of the Seller.

**2.2    Deposit.** Within three (3) days of execution of this Agreement, Buyer will tender to the Escrow Agent, pursuant to Section 11.13 hereof, a deposit of Fifty Thousand and NO/100 DOLLARS ($50,000.00), to be held in a separate interest-bearing account in a federally insured institution within the Commonwealth of Virginia, which amount will be credited against the Purchase Price at the Closing.

**2.3    Purchase Price.** The purchase price (the "Purchase Price") to be paid for the Purchased Assets shall consist of the sum of: (a) Six Hundred Thousand AND NO/100 DOLLARS ($600,000.00) as the purchase price for the goodwill of the Business and (b) the purchase price, as will be set forth on Schedule 1.5, of each of: the Parts and Accessories; the Special Tools; the Leasehold Building Interest; and the Furniture and Fixtures. The Parties

acknowledge that the Purchase Price for the Parts and Accessories, the Special Tools, and the Furniture and Fixtures will be based upon information contained in the Bill of Sale and the Inventory, both of which are to be completed and delivered at or prior to the Closing Date. The Parties also acknowledge that adjustments to those categories of Purchased Assets may have to be made up to and including the Closing Date to reflect ordinary course increases or decreases in those assets between the time of delivery of such Schedules and the Inventory and the Closing Date, and that the related components of the Purchase Price will have to be adjusted to reflect any such adjustments to those assets. All of the foregoing adjustments (with appropriate payments by the Parties) will be made at the Closing, the Parties hereby agreeing to cooperate with each other in making such adjustments. Each Party will use the Purchase Price and Liabilities allocation described in Schedule 2.3 hereto in all reporting of the transaction upon Internal Revenue Service Form 8594, and all tax returns filed with, the Internal Revenue Service and other state and local taxing authorities but for no other purposes.

      **2.4**    **Payment of Purchase Price.** At the Closing, the Buyer shall pay the Purchase Price in cash or cleared funds, provided that upon agreement of the parties at or prior to Closing.

      **2.5**    **Prorations.** All personal property taxes and assessments which are past due or have become due upon any of the Purchased Assets on or before the Closing Date will be paid by Seller at Closing, together with any penalty or interest thereon. Current personal property taxes will be prorated and adjusted between Buyer and Seller as of the Closing Date on a due date basis. If current tax bills are unavailable at the Closing Date, the prior year's tax bills will be used for proration purposes, and taxes will be re-prorated between Buyer and Seller when the current year's tax bills are received. Any amounts owed by either Party with respect to such re-proration will be paid to the other Party within ten (10) days of the determination of such re-proration. All operating expenses of the Business for the month of Closing, to the extent they cannot be specifically allocated to Buyer or Seller, will be prorated and adjusted between Buyer and Seller as of the Closing Date based on a 30-day month.

      **2.6**    **Assignment and Assumption.** Except for the Existing Lease to be assigned to Buyer, the Buyer does not and will not assume or become liable, or otherwise be responsible, for any other obligations or liabilities of the Seller of any kind whatsoever, fixed or contingent, known or unknown, and whether or not any of such liabilities or obligations are the subject matter of any of the representations and warranties of the Seller in this Agreement (collectively, the "Retained Liabilities"), as a result of the transactions contemplated in this Agreement. The Seller shall retain and agrees to satisfy and discharge, and otherwise be responsible for, all of the Retained Liabilities. Should Buyer wish to assume any equipment leases, they will be attached to a Schedule to be appended hereto and as a condition of such assumption, all payments due thereon from Seller at Closing shall be paid .

3

# ARTICLE III

*Intentionally deleted*


# ARTICLE IV

## PARTS/ACCESSORIES

**4.1** **The Inventory.** The Buyer and the Seller shall engage a mutually acceptable third party engaged in the business of appraising, valuing and preparing inventories for automobile dealerships (hereinafter referred to as the "Inventory Service") to prepare an inventory list (the "Parts Inventory") of the parts and accessories, owned by and either used or held for use by the Seller in the Business. The Inventory shall be posted to the Manufacturer's approved system of inventory control. The cost of appraising, valuing and preparing the Parts Inventory shall be borne 50% by the Buyer and 50% by the Seller. Seller's portion of this cost shall be credited against the Purchase Price. The Parts Inventory shall be completed by the Inventory Date. The Parts Inventory shall identify each part and accessory and its current cost.

**4.2** **Returnable and Non-Returnable Replacement Parts and Accessories.** The Parts Inventory shall classify replacement parts and accessories as "returnable" or "non-returnable." For purposes of this Agreement, the terms "returnable parts" and "returnable accessories" shall describe and include only those parts and accessories listed in the current Subaru parts and accessories catalog (the "Master Price List") as returnable to the Manufacturer, and that are otherwise returnable to the Manufacturer, and which are also less than 12 months in age.

**4.3** **Purchase of Parts and Accessories.** The Buyer shall purchase all returnable Parts and Accessories. The purchase price for each "returnable part" and "returnable accessory" shall be the current dealer cost of such part or accessory. All parts and accessories listed (coded) in the Master Price List as not returnable to the Manufacturer shall be classified as "non-returnable." The Buyer shall not be required to purchase any non-returnable or obsolete parts (which shall include any parts for which no sales have been made in the last 10 completed months prior to contract execution) or accessories and those not purchased shall be retained by the Seller. The Buyer agrees to provide access to the Seller for the purpose of removing any parts and accessories that Buyer does not purchase during the thirty (30) day period following Closing. Any nonreturnable parts remaining on the Site thirty (30) days after the Closing Date shall be deemed to be abandoned by the Seller.

4

# ARTICLE V

## SPECIAL TOOLS, LEASEHOLD BUILDING INTEREST, FURNITURE AND FIXTURES,
### AND OPERATING ASSETS

**5.1    Special Tools.** At the Closing, the Buyer shall purchase all special tools, in good working order (as reasonably determined by Buyer), at an amount equal to the Subaru purchase price of such tools less the lower of either 50% of their purchase price or their depreciated value at Closing (based on straight line depreciation).

**5.2    Leasehold Building Interest.** At Closing, Buyer shall purchase the Leasehold Building Interest from Seller for the sum of Four Hundred Eighty Five Thousand Dollars ($485,000.00) provided that as a condition of Closing that leasehold deed of trust dated July 15, 2002 for the benefit of DaimlerChrysler Services North America and any other lien on the leasehold property shall be released.

**5.3    Furniture and Fixtures.** At the Closing, the Buyer shall purchase that specific furniture and fixtures used in the Building at the leased premises selected by Buyer which list shall be provided to Seller. The purchase price for the furniture and fixtures shall be at the depreciated value (using straight line depreciation) shown on Seller's current financial statement (as generally submitted to the Manufacturer) as of Closing, using generally accepted accounting principles, consistently applied, provided the purchase price for the Fixed Assets shall not include the value of any items of Fixed Assets which are leased pursuant to contracts or leases. No Fixed Assets not on Buyer's list or not physically identifiable and located on the Site on the Closing Date, nor any Fixed Assets not in working order on the Closing Date, shall be purchased.

**5.4    Operating Assets.** At the Closing, and without payment of any additional consideration, the Buyer shall purchase all of the Seller's Operating Assets such as customer lists, manuals, point of sale materials and merchandising materials and all other soft assets, including phone numbers, electronic access to customer service records and web-site addresses. Seller agrees to cooperate to cause such assets to be transferred to Buyer for no additional consideration.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows:

**6.1     Organization; Power and Authority; Authorization.**     The Buyer is a corporation duly organized and in good standing under the laws of the Commonwealth of Virginia, qualified to do business and in good standing in which the nature of its business makes such qualification necessary and has full power and authority to own or use the properties it purports to own and use and to carry on its business. The Board of Directors of the Buyer has, or prior to the Closing will have duly approved this Agreement, all other agreements, certificates and documents executed or to be executed by the Buyer in connection herewith, and the transactions contemplated hereby and thereby. The Buyer has full power and authority to execute and deliver this Agreement and all other agreements, certificates and documents executed or to be executed by the Buyer in connection herewith to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. This Agreement, and all other agreements, certificates and documents executed or to be executed by the Buyer in connection herewith, constitute or, when executed and delivered will constitute, legal, valid and binding agreements of the Buyer and enforceable against the Buyer in accordance with their respective terms.

**6.2     Non-Violation; Consents.**     The execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof do not and will not: (a) conflict with or violate any of the provisions of the Buyer's Articles of Incorporation or Bylaws, each as amended, or any resolution of the Board of Directors or the Stockholders of the Buyer; (b) violate any law, ordinance, rule or regulation or any judgment, order, writ, injunction or decree or similar command of any court, administrative or governmental agency or other body applicable to the Buyer; (c) violate or conflict with or result in a breach of, or constitute a default under, any material instrument, agreement or indenture or any mortgage, deed of trust or similar contract to which the Buyer is a party or by which the Buyer is bound or affected; or (d) require the consent, authorization or approval of, or notice to, or filing or registration with, any governmental body or authority, or any other third party (other than the approvals pursuant to Section 8.5).

**6.3     No Brokers.**     Neither Buyer nor any of its principals is a broker or is operating on behalf of a broker, an internet company seeking to become a motor vehicle dealer, or any other company which is known by the principals of the Buyer to be unacceptable to any franchisor. Buyer has not entered into any contract, arrangement or understanding with any person or firm which may result in the obligation of Seller to pay any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby, and Buyer is not aware of any claim or basis for any claim for payment of any finder's fees, brokerage or agent's commissions or other like payments in connection with the negotiations leading to this Agreement or the consummation of the transactions contemplated hereby.

6

**6.4     No Misstatements or Omissions.**  No representation or warranty made by the Buyer in this Agreement, and no statement contained in any agreement, instrument, certificate or schedule furnished or to be furnished by the Buyer pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make such representation or warranty or such statement not misleading.

**6.5     Survival.**   Notwithstanding anything to the contrary herein, the representations and warranties of Buyer contained in this Article VI shall survive Closing under this Agreement for a period of two (2) years following Closing.

### ARTICLE VII

#### REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Buyer, as follows:

**7.1     Organization; Power and Authority; Authorization.**   The Seller is a corporation duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia, is duly qualified to do business and is in good standing in Virginia and in every jurisdiction in which the nature of its business makes such qualification necessary and has full corporate power and authority to own or use the properties it purports to own and use and to carry on its business as now being conducted. The Seller has full corporate power and authority to execute and deliver this Agreement and all other agreements, certificates and documents executed or to be executed by it in connection herewith, to consummate the transactions contemplated hereby and thereby and to perform its obligations hereunder and thereunder. This Agreement, and all other agreements, certificates and documents executed or to be executed by the Seller in connection herewith, have been duly authorized by all necessary corporate action and constitute or, when executed and delivered will constitute, legal, valid and binding agreements of the Seller enforceable against the Seller in accordance with their respective terms.

**7.2     Non Violation; Consents.**  To the best of Seller's knowledge, the execution and delivery of this Agreement, the consummation of the transactions contemplated by this Agreement and compliance with the provisions hereof do not and will not: (a) conflict with or violate any of the provisions of the Buyer's  Articles of Incorporation or Bylaws, each as amended, or any resolution of the Board of Directors or the Stockholders of the Buyer; (b) violate any law, ordinance, rule or regulation or any judgment, order, writ, injunction or decree or similar command of any court, administrative or governmental agency or other body applicable to the Buyer; (c) violate or conflict with or result in a breach of, or constitute a default under, any material instrument, agreement or indenture or any mortgage, deed of trust or similar

7

contract to which the Buyer is a party or by which the Buyer is bound or affected; or (d) require the consent, authorization or approval of, or notice to, or filing or registration with, any governmental body or authority, or any other third party (other than the approvals pursuant to Section 8.5).

      **7.3**    **Litigation.**   There are no actions, suits or proceedings pending or, to the best of Seller's knowledge, threatened against the Seller which might adversely affect the power or authority of Seller to carry out the transactions to be performed hereunder or could reasonably be expected to have a material adverse effect upon the Assets or the Liabilities of the Seller or the business, prospects, properties, earnings, results of operations or condition (financial or otherwise) of the Business.

      **7.4**    **Title to Assets; Encumbrances.**   The Seller has good title to the Assets, and at Closing shall convey title to them free and clear of all liens (including tax liens), security interests, encumbrances, actions, claims, payments or demands of any kind and character (collectively, "Encumbrances"). There is no existing claim, or, to the best of Seller's knowledge, any basis for any claim, against the Seller that the Business or any of its operations, activities or products infringe the patents, trademarks, trade names, copyrights or other property rights of others or that the Seller is wrongfully or otherwise using the property rights of others. There is no existing claim, or, to the best of Seller's knowledge, any basis for any claim, by the Seller against any third party that the operations, activities or products of such third party infringe the patents, trademarks, trade names, copyrights or other property rights of the Seller or that such other third party is wrongfully or otherwise using the property rights of the Seller.

      **7.5**    **Financial Statements.**   All of Seller's financial statements have been prepared in accordance with the Manufacturer's requirements applied consistently.

      **7.6**    **Brokers and Finders.**   Seller has engaged Webber Ghaban & Associates as a broker in connection with this Agreement and the consummation of the transactions contemplated hereby. At closing, Webber Ghaban & Associates shall be paid out of the proceeds due the Seller.

      **7.7**    **No Misstatements or Omissions.**   No representation or warranty made by the Seller in this Agreement, and no statement contained in any agreement, instrument, certificate or schedule furnished or to be furnished by the Seller pursuant hereto, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in order to make such representation or warranty or such statement not misleading.

      **7.8**    **Compliance with Laws.**

      (a)    Except as set forth in Schedule 7.8, to the best of Seller's knowledge, the Purchased Assets and the Site comply in all material respects with, and the Business has been

conducted in all material respects in compliance with, all laws, rules and regulations (including all worker safety and all Environmental Laws, applicable zoning and other laws, ordinances, regulations and building codes, and Seller has not received any notice of any violation thereof which has not been remedied.

(b) Seller has no notice of any environmental action by any government agency and, to the best of Seller's knowledge no environmental condition or hazardous materials exist on the Site which is in violation of applicable law. The term "hazardous materials" means any flammable items, explosives, radioactive materials, hazardous or toxic substances, material or waste or related materials, including any substances defined as or included in the definition of "hazardous substances," "hazardous wastes," infectious wastes," hazardous materials" or "toxic substances" now or subsequently regulated under any federal, state or local laws, regulations or ordinances including, without limitation, oil, petroleum-based products, paints, solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, PCBs and similar compounds, and including any different products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons, excepting those small quantities of such materials commonly used in Seller's business and kept and stored in accordance with all legal requirements. Seller warrants it has not caused or permitted any hazardous materials to be generated, produced, brought upon, used, stored, treated, discharged, released, spilled or disposed of on, in, under or about the Site. Seller warrants it is not in breach of any environmental requirements of it under the Lease.

**7.9** **Taxes.** Except as set forth in Schedule 7.9, to the best of Seller's knowledge, the Seller has filed all federal, state and local governmental tax returns required to be filed by it in accordance with the provisions of law pertaining thereto and has paid all taxes and assessments (including, without limitation of the foregoing, income, excise, unemployment, social security, occupation, franchise, property and import taxes, duties or charges and all penalties and interest in respect thereof) required by such tax returns or otherwise to have been paid to date.

**7.10** **Employees; Employee Benefit Plans.** To the best of Seller's knowledge, the consummation of the acquisition of the Assets and all other transactions related thereto will not trigger, result in, or cause to mature any employee benefit, any employee-benefit-related claim or any contingent or deferred right to payment or compensation, whether asserted by any employee connected with the Business or any other person or entity, including any governmental authority. Seller has not maintained, participated in or made contributions to any retirement plan (including, without limitation, any multi-employer pension plan) as defined in the Employee Retirement Income Security Act of 1974, as amended, or under any other state or federal statute regulating pension plans, on behalf of any of its employees. Seller warrants that at Closing it shall have paid in full any vacation, sick leave or other employee benefits due its employees.

**7.11** **Bulk Sales.** In connection with this Agreement, Seller shall comply with the Virginia Uniform Commercial Code, as applicable, and with all other applicable requirements in

9

Virginia relating to bulk transfers to the reasonable satisfaction of counsel for the Buyer. Seller and Seller's owner shall execute an affidavit of compliance with the Bulk Sales Act at closing.

**7.12** **Survival.** Notwithstanding anything to the contrary herein, the representations and warranties of Seller contained in this Article VII shall survive Closing under this Agreement for a period of two (2) years following Closing; provided, however, that Seller's representations and warranties contained in Section 7.4 related to the title of the Assets shall survive indefinitely.

## ARTICLE VIII

### CONDITIONS PRECEDENT TO THE BUYER'S OBLIGATIONS

The obligations of the Buyer to perform this Agreement at Closing are subject to the following conditions precedent which shall be fully satisfied at or before the Closing, unless waived in writing by the Buyer.

**8.1** **Representations and Warranties.** All of the representations and warranties of the Seller contained herein shall be true and correct in all material respects on and as of the Closing Date as if made on and as of the Closing Date, and the Buyer shall have received a certificate from a duly authorized officer of the Seller, dated as of the Closing Date, to such effect.

**8.2** **Compliance with Agreements.** Each of the agreements or obligations required by this Agreement to be performed or complied with by the Seller at or before the Closing Date shall have been duly performed or complied with in all material respects, and the Buyer shall have received a certificate from a duly authorized officer of the Seller, dated as of the Closing Date, to such effect.

**8.3** **Corporate Organization.** The Seller shall have furnished to the Buyer certificates of the good standing of the Seller issued by the Virginia State Corporation Commission which certificates shall be dated no earlier than thirty (30) days prior to the Closing Date.

**8.4** **Corporate Resolutions.** The Seller shall have furnished to the Buyer a copy of the resolutions duly adopted by the directors and the stockholders of the Seller, authorizing the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

**8.5** **Approvals.** The Buyer shall have obtained, in writing the authorization and approval by Subaru of America ("Manufacturer Approval") of this Agreement and the transactions contemplated hereby on terms and conditions satisfactory to Buyer in Buyer's sole

10

discretion. In connection therewith, the Parties covenant and agree to cooperate fully with each other and to use their best efforts to expeditiously obtain the Manufacturer Approval and to respond promptly to any and all requests for information or documentation from the Manufacturer Notwithstanding the provisions herein, if the Manufacturer shall exercise its right of first refusal, then this Agreement shall be void and of no further effect at the option of the Buyer in which case Buyer and Seller shall be released from any and all obligations or liabilities under this Agreement.

8.6     Bankruptcy Court Approvals.   The Seller and Buyer acknowledge that this Agreement, the sale of the Purchased Assets, and the assignment of the Existing Lease are subject to approval of the United States Bankruptcy Court for the Eastern District of Virginia ("Bankruptcy Court") in Seller's pending bankruptcy case, *In re Gunning Motors, Inc.*, Case No. 10-11896.   The Seller and Buyer acknowledge that in order to obtain approval of these transactions, Seller must demonstrate that it has taken reasonable steps to obtain the highest and best offer possible for the Purchased Assets, including but not limited to, giving notice of the transaction contemplated by this Agreement to creditors and certain other interested parties as may be ordered by the Bankruptcy Court.   As soon as reasonably possible after the execution of this Agreement, Seller shall file a sale motion with the Bankruptcy Court seeking approval of the transactions contemplated by this Agreement, including the sale of the Purchased Assets pursuant to 11 U.S.C. § 363 free and clear of all liens, claims and encumbrances, and assignment of the Existing Lease and seeking the ability to proceed to closing immediately upon entry of an order (in a form acceptable to Buyer) approving such motion ("Sale Motion"), together with required supporting papers and required notices, and shall take all actions as are necessary to request a prompt hearing to approve, as soon as practical, the Sale Motion.

8.7     **Bills of Sale, Etc.** The Seller shall have executed, as appropriate, and delivered to the Buyer the Bill of Sale, other documents of transfer of title contemplated hereby and any and all other documents necessary in connection with the transfer of the Assets.

8.8     **Financing.** The Buyer shall have received bank financing for this transaction in form and amount satisfactory to Buyer in Buyer's sole discretion or Buyer may terminate this Agreement.   This contingency shall expire automatically if Buyer does not terminate this Agreement within 40 days of execution hereof.

8.9     **Leasehold Property.** The Leasehold Property shall be suitable to Buyer in Buyer's sole discretion, including Buyer's receipt of a satisfactory Phase 1 environmental report at its cost, and verification from the governmental authorities that the Leasehold Property may be utilized for Buyer' intended use of the sale, service and repair of new and used vehicles, or Buyer may terminate this Agreement. This contingency shall expire automatically if Buyer does not terminate this Agreement within 40 days of execution hereof.   Furthermore, at Closing all obligations then due and owing under the Existing Lease shall be paid in full (or paid to the

Landlord out of the proceeds due Seller) and any prepaid rent shall be prorated based on the date of Closing. In the event a utility bill for the Leased Premises has not been received at Closing for utility charges incurred as of Closing, an appropriate sum shall be retained in escrow for such obligation.


# ARTICLE IX

## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SELLER

The obligations of the Seller to perform this Agreement at Closing are subject to the following conditions precedent which shall be fully satisfied at or before the Closing, unless waived in writing by the Seller:

**9.1**     **Representations and Warranties.**  All of the representations and warranties of the Buyer herein contained shall be true and correct in all material respects on and as of the Closing Date as if made on and as of the Closing Date, and the Seller shall have received a certificate from a duly authorized officer of the Buyer, dated as of the Closing Date, to such effect.

**9.2**     **Compliance with Agreements.**  Each of the agreements or obligations required by this Agreement to be performed or complied with by the Buyer at or before the Closing shall have been duly performed or complied with in all material respects, and the Seller shall have received a certificate from a duly authorized officer of the Buyer, dated as of the Closing Date, to such effect.

**9.3**     **Corporate Organization.**  The Buyer shall have furnished to the Seller a certificate of good standing for the Buyer issued by the Virginia State Corporation Commission dated no earlier than thirty (30) days prior to the Closing Date.

**9.4**     **Corporate Resolutions.**  Buyer shall have furnished to Seller the resolutions duly adopted by the Board of Directors and Stockholders of Buyer authorizing the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

**9.5**     **Payment of Purchase Price.**  The Buyer shall have tendered to the Seller the Purchase Price and assumed the Lease.

**9.6**     **Bankruptcy Court Approval.**  The Bankruptcy Code shall have entered an order approving the Sale Motion and extinguishing any liens on the conveyed assets.

## ARTICLE X

### COVENANTS AND AGREEMENTS

**10.2** **Further Assurances**. Each Party will execute and deliver any further instruments or documents, and take all further action reasonably requested by the other Party to carry out the transactions contemplated by this Agreement. No such document will expand the scope or duration of any representation, warranty, or agreement set forth herein.

**10.3** **Satisfaction of Closing Conditions**. The parties hereto shall use their reasonable best efforts to obtain, and to cooperate with each other in obtaining, all authorizations, approvals, licenses, permits and other consents required to consummate the transactions contemplated by this Agreement.

**10.4** **No Material Adverse Changes**. During the period from the date of this Agreement through the Closing Date, the Seller will operate the Business in the ordinary course of business and in accordance with past practices. The Seller shall promptly notify the Buyer of any material adverse change or development in any of the Assets or the Liabilities or in the prospects, properties, earnings, results of operations or condition (financial or otherwise) of the Business, and of the occurrence of any event or circumstances that will, or could reasonably be expected to, result in such a material adverse change.

**10.5** **Indemnification**.

(a) Seller ("Selling Indemnitor") hereby agrees to hold harmless and indemnify Buyer and its permitted assigns, from and against any claim, action, loss, liability, damage, or cost and expense, including, without limitation, reasonable attorney's fees (hereinafter collectively referred to as ("Losses"), resulting from or arising out of:

(i) The imposition of transferee liability pursuant to the Virginia Bulk Sales Act; or

(ii) Any breach or inaccuracy of any representation or warranty or nonperformance of any agreement or covenant on the part of Selling Indemnitor contained in this Agreement in a schedule or in any certificate or other document delivered pursuant hereto; or

(b) Buyer ("Buying Indemnitor") hereby agrees to hold harmless and indemnify Seller from and against any claim, action, loss, liability, damage, or cost and expense, including, without limitation, reasonable attorney's fees (hereinafter collectively referred to as ("Losses"), resulting from or arising out of:

(i) Any liability arising from or with respect to the use or sale of the

13

Purchased Assets and the operation of the Business after the Closing Date; and

(ii) Any breach or inaccuracy of any representation or warranty, non-performance of any agreement or covenant on the part of Buying Indemnitor contained in this Agreement in a schedule or in any certificate or other document delivered pursuant hereto; and

(iii) Any failure by Buyer to satisfy and discharge any liability or obligation expressly assumed by Buyer pursuant to this Agreement as and when due and payable.

10.6 Intentionally deleted.

**10.7 Regarding the Manufacturer.** Immediately upon the execution of this Agreement, the Seller will notify the Manufacturer regarding the transactions contemplated by this Agreement. The Seller shall fully cooperate with the Buyer, and take all reasonable steps to assist the Buyer's efforts to obtain its Dealer Sales and Service Agreement with the Manufacturer. The Parties acknowledge that the Buyer's Dealer Sales and Service Agreement is subject to the approval of the Manufacturer and that the Buyer would be unable to obtain its own, similar Dealer Sales and Service Agreement absent the Seller's termination of its agreement, contingent upon completion of Closing and approval by the Bankruptcy Court.

**10.8 Seller's Employees.** The Buyer shall have the right, but not the obligation, to employ any or all of the Seller's employees.

**10.9 Termination; Effect of Termination.**

(a) Notwithstanding any other provision herein contained to the contrary, this Agreement may be terminated at any time prior to the Closing:

(i) by the written mutual consent of the parties hereto prior to the Closing Date;

(ii) by Buyer, by written notice to Seller, if Buyer notifies Seller of termination of the Agreement within the time periods set forth in Sections 8.6, 8.9 and 8.10, or if any of Buyer's conditions precedent to Closing under Article 8 hereof has not been satisfied as of the Closing Date or has become incapable of being satisfied by the Closing Date without fault of Buyer.

(iii) by Seller, by written notice to Buyer, if any of Seller's conditions precedent to Closing under Article 9 hereof has not been satisfied as of the Closing Date or has become incapable of being satisfied by the Closing Date without fault of Seller; or

14

(iv)    at any time after the Closing Date, by written notice by the Buyer or the Seller to the other Parties hereto if the Closing shall not have occurred on or before the Closing Date through no fault of the Party seeking termination;

(b)    In the event of termination of this Agreement pursuant to Section 10.9(a), this Agreement shall be of no further force or effect; provided, however, that any termination pursuant to Section 10.9(a) shall not relieve: (i) any Party hereto of any liability for breach of any representation, warranty, covenant or agreement hereunder occurring prior to such termination; or (ii) any Party hereto of its obligations hereunder to pay the fees and expenses of third parties; provided, further, that all filings, applications and other submissions made pursuant to this Agreement or prior to the execution of this Agreement in contemplation hereof shall, to the extent practicable, be withdrawn from the agency or other entity to which made. The Parties' rights under this Section 10.9 are cumulative and are in addition to the other rights and remedies available to them under any other agreement or applicable law. In the event of a termination under this Section 10.9, each of the Parties will redeliver all documents, work papers and other material of the other appropriate party relating to the transactions contemplated hereby, and the Deposit will be released to the Buyer.

**10.10  Breach.**

(a)    In the event Closing does not occur as a result of a material breach of any term or condition of this Agreement by Buyer, then Seller shall retain the Deposit and all accrued interest thereon as liquidated damages in full satisfaction of any claim for damages due to a breach by Buyer of this Agreement it being agreed that the amount of damages sustained by Seller in the event of Buyer's breach are not reasonably subject to calculation.

(b)    In the event Closing does not occur as a result of a material breach of any term or condition of this Agreement by Seller, then Buyer shall be entitled to the immediate refund of the Deposit plus all interest thereon and shall be entitled to pursue its remedies allowed by law or equity, including specific performance of this Agreement, if available, in accordance with the terms of this Agreement.

**10.11  Cooperation.**  Each Party will cooperate fully with the others in preparing and filing all notices, applications, reports and other instruments and documents which are required by any statute, rule, regulation or order of any person in connection with the transactions contemplated by this Agreement. This cooperation shall include, but shall not be limited to, the cooperation and furnishing of information by Seller in connection with the efforts of Buyer to obtain any government approval required for it to be able to own the Purchased Assets, to operate the Business as it has been operated heretofore or as it may be operated by Buyer hereafter, and to occupy the Site as necessary to operate the Business. After Closing, each party agrees to execute such further documents and take such further actions as may be reasonably requested by the other party in order to carry out the intent of this Agreement

**10.12 Change of Name; Transfer of URLs.** Immediately upon Closing, Buyer shall file all documents necessary to change the name of the Business to a New Corporate Name. As of and effective upon Closing, Seller shall transfer, at no cost, any URLs containing or using the names of "Manassas Subaru" to Buyer. At and following Closing Seller agrees to cooperate with Buyer to accomplish such transfer.

## ARTICLE XI

### BREAK UP FEE

Seller acknowledges that (a) the Buyer has made and will make a substantial investment in time and will incur substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, its due diligence with respect to the Purchased Assets and its efforts to consummate the transaction contemplated herein, and (b) that the Purchaser's efforts have substantially benefited the Seller and will benefit the bankruptcy estate of the Seller through the submission of the offer reflected in this Agreement, which will serve as a minimum bid on which other potentially interested bidders can rely. Therefore, as compensation for entering into this Agreement, taking action to consummate the transaction contemplated hereby, and incurring costs and expenses related thereto and other losses and damages, including foregoing opportunities, the Seller agrees as follows, subject however, to the Bankruptcy Court approval of this provision of the Agreement, to pay the Buyer upon closing of an alternative transaction for the sale, transfer or conveyance of all or a portion of the Purchased Assets, the Existing Lease or the Subaru Dealer to any third party an amount equal to 2% of the price paid by such third party or parties (the "Break-Up Fee"). The provisions of this section shall survive termination of this Agreement. In connection with the filing of the Sale Motion, Seller shall seek prior approval of the provisions of Article XI.

## ARTICLE XII
### MISCELLANEOUS

**12.1 Assignment.** The parties agree that Buyer may, at its sole discretion, assign this Agreement to another entity provided that William E. Schuiling possesses majority control of such entity.

**12.2 Governing Law.** The interpretation and construction of this Agreement, and all matters relating hereto, shall be governed by the laws of the Commonwealth of Virginia.

**12.3 Accounting Matters.** All accounting matters required or contemplated by this Agreement shall be in accordance with manufacturer requirements.

16

**12.4** **Fees and Expenses.** Except as otherwise specifically provided in this Agreement, each of the Parties hereto shall be responsible for the payment of such Party's fees, costs and expenses incurred in connection with the negotiation and consummation of the transactions contemplated hereby.

**12.5** **Amendments; Merger Clause.** This Agreement, including the schedules and other documents referred to herein which form a part hereof, contains the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement may not be amended except by a writing executed by all of the Parties hereto. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

**12.6** **Waiver.** To the extent permitted by applicable law, no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by a party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by all the parties hereto. Any waiver by a party hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach of such provision or any other provision of this Agreement. No extension of time for performance of any act will be deemed an extension of time for performance of any other act.

**12.7** **Notices.** Except as otherwise expressly set forth in this Agreement, all notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given on the same day they are sent by either hand delivery, nationally recognized overnight courier, or certified mail, return receipt requested, at the following addresses:

| Notices to Seller: | Gunning Motors, Inc. |
|---|---|
| | Attn: John Gunning President |
| | 9020 Liberia Avenue |
| | Manassas, Virginia 20110 |
| | |
| with a copy to | Michael G. Charapp, Esquire |
| | Charapp & Weiss, LLP |
| | 8300 Greensboro Drive Suite 200 |
| | McLean, Virginia 22102 |
| | |
| Notices to Buyer: | Brown Automotive Group, Ltd. |
| | Attn: Charles S. Stringfellow, Jr. |
| | 12500 Fair Lakes Circle Suite 375 |
| | Fairfax, VA 22033 |

with a copy to:                Michael J. Holleran, Esquire
                                     Walton & Adams, P.C.
                                     1925 Isaac Newton Square, Suite 250
                                     Reston, VA 20190

      **12.8   Counterparts**. This Agreement may be executed in any number of counterparts. Each such counterpart hereof shall be deemed to be an original instrument, and all such counterparts together shall constitute but one agreement.

      **12.9   Intentionally deleted.**

      **12.10  Permitted Successors; Assigns; No Third Party Beneficiaries.** This Agreement shall be binding upon, inure to the benefit of and be enforceable by the respective successors, heirs and assigns of the Parties hereto. Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon or give to any employee of the Seller, or any other person, firm, corporation or legal entity, other than the Parties hereto and their successors and permitted assigns, any rights, remedies or other benefits under or by reason of this Agreement.

      **12.11 Headings**. The article headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

      **12.12  Severability; Construction.**

          (a)    In the event that any provision, or part thereof, of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions, or parts thereof, shall not in any way be affected or impaired thereby.

          (b)    This Agreement shall be construed equitably, in accordance with its terms, without regard to the degree which the Seller or the Buyer, or their respective legal counsel, have participated in the drafting of this Agreement.

      **12.13  Duties of the Escrow Agent.**

          (a)    Release and Payment Events. The law offices of Walton & Adams, P.C., Suite 250, 1925 Isaac Newton Square, Reston, Virginia 20190, shall act as Escrow Agent. The Escrow Agent shall release, pay, deliver, transfer and assign the Deposit by wire transfer of federal funds in accordance with the following:

(i)     To Seller at the Closing.

(ii)    To Buyer in the event of a permitted termination of the Agreement pursuant to Section 10.9.

(iii)   To Buyer, if the Closing shall fail to take place because of a default by Seller in its obligations under the Agreement.

(iv)    To Seller, if the Closing shall fail to take place because of a default by Buyer in its obligations under the Agreement.

(v)     To Seller or Buyer, as applicable, upon receipt of written instructions, signed by both Seller and Buyer, to so release and deliver the Deposit.

(b)     Procedures to Obtain Release and Payment.

(i)     Upon the occurrence of any of the events set forth in subsection 11.13(a) above, the party entitled to the Deposit shall deliver written instructions to the Escrow Agent which also contain a description of the applicable release and payment event.

(ii)    If the written instructions are signed by both Seller and Buyer and are delivered pursuant to Section 11.13(a)(v), the Escrow Agent shall promptly release and deliver the Deposit as directed in such instructions.

(iii)   If the written instructions have been delivered to the Escrow Agent by Buyer, and relate to a Section 11.13(a)(ii) or Section 11.13(a)(iii) event, or by Seller and relate to a Section 11.13(a)(iv) event, the Escrow Agent shall promptly send a copy thereof to the other Party. Such other Party shall have ten (10) business days following the date of its receipt of a copy of such written instructions in which to object to the requested disbursement of the Deposit by sending a written objection thereto to the Escrow Agent. If the Escrow Agent shall not have timely received such a written objection, the Escrow Agent shall promptly release and deliver the Deposit as directed in the written instructions. If the Escrow Agent shall have received a written objection on or before such tenth (10th) business day, the Escrow Agent shall interplead such funds into the Circuit Court of Prince William County, Virginia, and thereafter be relieved of all further liability as Escrow Agent.

(c)     Investment of the Escrow Deposit. The funds deposited with the Escrow Agent pursuant to this Agreement shall be invested by the Escrow Agent in an interest- bearing account. In order to open and administer any such interest-bearing account, Escrow Agent is hereby authorized to utilize Buyer's Taxpayer Identification Number.

(d) Termination of Escrow Provisions of this Agreement. The escrow provisions of this Agreement shall terminate upon disbursement of the Deposit or as otherwise set forth herein. Upon such termination, the Escrow Agent shall be released from, and shall not have any further liabilities or obligations under, this Agreement.

(e) Liability of Escrow Agent. The acceptance by the Escrow Agent of its duties as such under this Agreement is subject to the following terms and conditions, which all Parties to the Agreement hereby agree shall govern and control with respect to the rights, duties, liabilities, and obligations of the Escrow Agent:

(i) The Escrow Agent is not a party to, and is not bound by, any agreement which may be evidenced by, or arise out of, the foregoing written instructions, other than as expressly set forth herein. The Escrow Agent also is not a party to and has no responsibilities under the provisions of this Agreement.

(ii) The duties of the Escrow Agent set forth herein are purely ministerial in nature, and the Parties hereto release the Escrow Agent from any act done or omitted to be done by it in good faith and in the performance of its duties hereunder. In addition, the Escrow Agent shall have no responsibility for determining or ascertaining the accuracy, sufficiency or completeness of the facts alleged in any written instruction.

(iii) The Escrow Agent shall not incur any liability to Seller or Buyer by acting in accordance with the terms of the provisions of this Escrow Agreement upon any written notice, request, waiver, consent, receipt or other paper or document which the Escrow Agent in good faith believes to be genuine. Moreover, the Escrow Agent shall not be liable for the sufficiency or correctness as to accuracy, completeness, form, manner, execution or validity of any instrument deposited to the escrow created hereby, or the identity, authority, or right of any person executing the same.

(iv) The Escrow Agent may consult with, and obtain advice from, independent legal counsel in the event of any dispute or question as to the interpretation of any of the provisions hereof or its duties hereunder, and it shall not incur any liability to Seller or Buyer and shall be fully protected by acting in good faith in accordance with any such opinion and instructions of such counsel.

(v) In the event the Escrow Agent becomes involved in any litigation arising out of this Escrow Agreement, it is hereby authorized to deposit with the clerk of the court of a court of competent jurisdiction any and all funds, securities or other property held by it pursuant hereto and, thereupon, shall stand fully relieved and discharged of any further duties, liabilities or obligations hereunder, and the escrow provisions of this Agreement shall terminate. Further, in the event the Escrow Agent is threatened with litigation arising out of the escrow provision of this Agreement, it is hereby authorized to interplead all interested parties in any

court of competent jurisdiction and to deposit with the clerk of the court of such court any and all funds, securities or other property held by it pursuant hereto and, thereupon, shall stand fully relieved and discharged of any further duties, liabilities or obligations hereunder, and the escrow provisions of this Agreement shall not be required by any provision hereof to institute legal proceedings of the kind referred to in this subsection.

(vi)     Seller and Buyer hereby agree, jointly and severally, to indemnify the Escrow Agent and hold it harmless from and against any and all loss, liability, expense (including attorney's fees and expenses) claim or demand arising out of or in connection with its acting as Escrow Agent under the escrow provisions of this Agreement, except for such loss, liability, expense, claim or demand which is judicially determined in a final order to have arisen out of the gross negligence or willful misconduct of the Escrow Agent. Such indemnification shall survive the resignation of the Escrow Agent or the termination of the escrow provisions of this Agreement.

(f)     Resignation of Escrow Agent. The Escrow Agent may at any time resign from its position hereunder by giving written notice of such resignation to Seller and Buyer at their respective addresses set forth in Section 11.7 hereof, at least ten (10) business days prior to the date specified for such resignation to take effect, and upon the effective date of such resignation all property then held by the Escrow Agent hereunder shall be delivered by it to such person as may be jointly designated in writing to the Escrow Agent by Seller and Buyer, whereupon all of the Escrow Agent's obligations hereunder shall cease and terminate. If no such person shall have been designated by such date, all obligations of the Escrow Agent hereunder shall nevertheless cease and terminate. The Escrow Agent's sole responsibility thereafter shall be to keep safely all cash and property then held by it pursuant to the escrow provisions of this Agreement and to deliver the same to a person designated by Seller and Buyer in accordance with the directions contained in a final order or judgment of a court of competent jurisdiction.

(g)     Waiver of Conflict. Seller recognizes Escrow Agent to be a law firm which regularly represents Buyer. In the event a dispute arises between the parties that cannot be resolved without arbitration, then Escrow Agent may appoint another Escrow Agent to act in its stead for the purpose of initiating a proceeding, as the substitute may deem proper. If a substitute Escrow Agent shall be so appointed, Seller hereby agrees that neither Michael J. Holleran nor Walton & Adams, P.C. shall be disqualified from representing Buyer in any action involving disposition of the Deposit or any other matter arising under the Agreement.

The Parties have executed and delivered this Agreement on the date set forth in the introductory paragraph of this Agreement.

*Signatures on next page*

21

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the day and year first above written.


**BUYER:**

BROWN AUTOMOTIVE GROUP, LTD.

By: _____ [seal]
Its: _____CEO_____
Printed Name: _CHARLES S. STRINGFELLOW, JR._


**SELLER:**

GUNNING MOTORS, INC.

By: _____
Its: _____President_____
Printed Name: ____John R. Gunning____


22

### INDEX OF EXHIBITS AND SCHEDULES
### TO
### ASSET PURCHASE AGREEMENT

*1.1*   *Exhibits*

      Exhibit A-1    Assets Conveyed

*1.2*   *Schedules*

      Schedule 1.5       Purchased Assets
      Schedule 2.3       Allocation of Purchase Price
      Schedule 7.8       Compliance with Laws (to be attached if applicable)
      Schedule 7.9       Taxes (to be attached if applicable)

## EXHIBIT "A-1"

## ASSETS CONVEYED
(To be attached at Closing)

Parts and Accessories Inventory returnable to the manufacturer (per physical inventory)

Fixed Assets (per Schedule attached)

Operating Assets including customer lists, manuals, point of sale materials, merchandising materials, phone numbers, web-site addresses, and customer sales, maintenance and repair records.

Leasehold Interest in Building

Goodwill

All other Company assets acquired by Buyer under the terms of the Asset Purchase Agreement dated March __, 2010.